

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-29-2001

# Duncan v. Morton

Precedential or Non-Precedential:

Docket 99-5551

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Duncan v. Morton" (2001). *2001 Decisions.* Paper 142.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/142

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 29, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5551

EDWARD LAMONTE DUNCAN

v.

WILLIS MORTON, ADMINISTRATOR;
ATTORNEY GENERAL OF THE STATE OF NEW JERSEY,
*JOHN J. FARMER, JR.

Edward L. Duncan,
        Appellant

*Amended pursuant to F.R.A.P. 43(c)(2)

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 98-cv--03715)
District Judge: Hon. Alfred M. Wolin

Argued January 8, 2001

Before: SLOVITER, ROTH, and RENDELL, Cir cuit Judges

(Filed: June 29, 2001)

        Arza R. Feldman
        Steven A. Feldman (Argued)
        Feldman & Feldman
        Hauppauge, N.Y. 11788

         Attorneys for Appellant

         Robert L. Cerefice (Argued)
         Office of County Prosecutor
         Newark, N.J. 07102

         Donald C. Campolo
         Assistant Attorney General
         Acting Essex County Prosecutor
         Newark, N.J. 07102

          Attorneys for Appellees

OPINION OF THE COURT

SLOVITER, Circuit Judge:

Petitioner Edward Duncan appeals from the order of the District Court denying his petition for a writ of habeas corpus. He argues that the court should have granted the writ because trial counsel had a conflict of inter est and was otherwise ineffective. He also contends the trial court gave an erroneous accomplice charge which infected the entire trial. The issues raised and the procedural posture in which they reach us can be placed in context following a brief review of the facts.

I.

Duncan, Anthony Norman, Douglas Sherman, Caldwell Moody ("Caldwell"), and Clarence Moody ("Clarence") were at the Moody brothers' apartment in Newark, New Jersey on February 18, 1989 when Robert Henderson and Norris Holmes arrived outside the building and honked the automobile horn. Duncan asked Caldwell to go out and send Henderson, with whom Norman appar ently had a drug-related monetary dispute, up to the apartment. When Henderson arrived at the apartment, accompanied by Holmes, they sensed a threat and fled, jumping through the building's glass door to escape. Duncan and Nor man pursued them, holding guns. Shots were fir ed, Henderson sustained a hand injury, and Holmes was killed by a single bullet shot. Duncan and Norman fled.

2

Duncan was arrested on March 12, 1989. After waiving his Miranda rights, he gave a voluntary statement in which he admitted that he was present at the Moodys' apartment on the night of February 18. He placed the r esponsibility of the shooting on Norman, describing the events as follows: Norman had identified Henderson as having pr eviously robbed him, and when Henderson drove up, accompanied by Holmes, Duncan directed Caldwell to get him and told Norman not to do anything. However, when Henderson and Holmes reached the apartment, Norman jumped at them with a gun and chased them down the stairs. Duncan then grabbed his gun and followed but the three others were already outside when he arrived downstairs and heard two gunshots. Norman told Duncan that he had shot Holmes in the leg. Seeing Holmes on the ground, Duncan led Norman inside and they left through the building's r ear exit. Later, Duncan returned the gun to Cully, who had given him the gun because Duncan watched over Cully's drug money.

Norman was arrested on March 13, 1989, and he also made a voluntary statement. He claimed that both he and Duncan collected money for Cully, a drug dealer , and had been looking for Henderson on the night of February 18 to avenge a robbery. When Henderson and Holmes dr ove up outside the apartment, Duncan sent Caldwell to get them. Then, Norman stated, both he and Duncan waited for them with guns, chased them down the stairs, and shot at them. When they saw Holmes injured on the ground, they fled through the building's back exit, and Duncan got rid of the guns by returning them to Cully who had provided them to Duncan. His version did not identify which shooter actually killed Holmes.

A. State Court Proceedings

Duncan, Norman, Sherman, and Caldwell were indicted for the purposeful or knowing murder of Holmes, aggravated assault on Henderson, and two weapon-possession offenses. Duncan hired attor ney Richard Roberts to represent him, agreeing to pay the lawyer from his $25,000 bail. Duncan told Roberts that Nor man also needed an attorney, and Roberts recommended Michael Pedicini. Although Roberts and Pedicini (and two other lawyers) shared office space at the time, they were not

officially partners and each had his own secretary, phone, and trust and expense accounts. When Norman retained Pedicini, the two attorneys agreed to split Duncan's bail money evenly.

The trial court severed the defendants' cases for trial. Norman was tried from February 14 to 16, 1990, represented by Pedicini, and was convicted of Holmes' murder, aggravated assault on Henderson, and the two counts of gun possession. On April 23, 1990, Duncan went to trial represented by Roberts, who introduced himself to the jury as "Richard M. Roberts, from the firm of Roberts, Pedicini and Fielo." 1T at 43.

At Duncan's trial, the prosecution called five witnesses, none of whom testified to witnessing the shooting. Clarence, the only witness present when Holmes was killed, recounted a confrontation between Norman and Henderson hours before Holmes' death and detailed the events in the Moody apartment before and after the shooting. Clarence's testimony portrayed Duncan as having a certain amount of authority over the group at the apartment. For example, he stated that Duncan had sent Norman to summon the Moody brothers back to their apartment after Norman's confrontation with Henderson, instructed Caldwell to bring Henderson up to the apartment after Norman identified Henderson for Duncan, and told Sherman to get out guns while waiting for Henderson to arrive. Clarence also testified that Duncan took a gun himself, gave a gun to Norman, hid behind the apartment door, confronted Henderson when he arrived, and, with Norman, chased Henderson and Holmes.

Detective Jack Eutsey, who had interviewed Duncan after his arrest, described the encounter and read Duncan's statement to the jury. Dr. Phito Pierre-Louis, the forensic pathologist who had performed Holmes' autopsy, described the cause of death (internal bleeding from a single gunshot wound). Officer Robert Purcell, who had responded to the shooting, described the scene and identified two bullets found there. Finally, Detective Frank Racioppi, the county investigator, detailed his efforts to find Henderson, a subpoenaed witness who failed to appear at the trial. After the State's case, the trial judge dismissed the assault

4

charge because the State had not met its bur den of proof, but denied Roberts' motion for acquittal of the mur der charge.

Although Duncan's statement was admitted into evidence and read as part of Detective Eutsey's testimony, Duncan himself did not testify at trial. Nor did Roberts call any witnesses on behalf of the defense. In his closing, Roberts acknowledged that Duncan possessed a gun on the night in question and told the jury it should retur n a guilty verdict as to gun possession, but kept emphasizing that the State had not met its burden of proof on the other charges. He attacked Clarence's credibility, and ur ged the jury to acquit Duncan of the murder charge. The pr osecutor, in turn, conceded he did not know whether Duncan or Nor man had fired the fatal shot, but insisted that Clar ence's testimony was credible, asserted that Duncan was guilty of purposeful murder either as a principal or as an accomplice, and emphasized that Duncan had orchestrated the incident that culminated in Holmes' death.

In charging the jury, the court gave detailed instructions on the murder and weapons counts, and on the lesser included offenses of aggravated and reckless manslaughter. The court also described the doctrine of transferr ed intent and gave a lengthy instruction on accomplice liability. During deliberations, the jury asked the court to"explain the definition [sic] between murder and aggravated manslaughter" and to "explain guilty by association." 4T at 2. In response, the court again read the murder, aggravated manslaughter, and accomplice liability char ges to the jury. The jury found Duncan guilty of murder and the weapon-possession offenses. On May 15, 1990, the court sentenced Duncan to a lengthy prison term1  for the murder, imposed a concurrent four-year sentence for thefirst gun-

_____

1. The government states in its brief, and the Appellate Division stated in
its opinion affirming Duncan's conviction, that Duncan was sentenced to life in prison with 30 years of parole ineligibility for Holmes' murder. The
sentencing hearing transcript and the sentencing for m appear, however, to impose a thirty-year sentence, as Duncan states in his brief. We do not attempt to resolve the differ ence as it does not bear on the issue before us.

possession offense but vacated the second gun–possession verdict as having merged with the mur der conviction.

Roberts, by then officially Pedicini's partner , filed an appeal of Duncan's conviction with the Appellate Division of the Superior Court of New Jersey ("Appellate Division"), challenging only the trial court's substitution of a deliberating juror and its admission of Duncan's allegedly involuntary statement. On July 12, 1991, in an unpublished per curiam opinion, the Appellate Division affirmed Duncan's conviction. Thereafter, Roberts ceased his representation of Duncan. The Supr eme Court of New Jersey denied Duncan's petition for certification on September 24, 1992. In a separate proceeding, Norman's conviction was also affirmed by the Appellate Division, and his petition for certification was denied.

B. State Court Collateral Proceedings

On May 11, 1993, Duncan filed a pro se  post–conviction relief ("PCR") petition. Attorney Connie Bentley McGhee filed a supplemental letter brief in support of the petition on January 6, 1995, and represented Duncan at his PCR hearing on January 25, 1995. The primary bases of Duncan's petition were ineffective assistance of counsel and his attorney's conflict of interest. Duncan, Roberts, and Alvin Norman ("Alvin"), Norman's brother, all testified at the hearing.

Roberts stated that he was a sole practitioner when Duncan hired him and during Duncan's trial. However, he acknowledged that he had entered into a partnership with Pedicini by the time he began preparing Duncan's appeal. As to fees, he testified that his division of Duncan's bail with Pedicini was not contingent on either attor ney's performance. Roberts also claimed he had made a full disclosure to Duncan regarding his impending partnership and that Duncan had not objected to it, although Roberts conceded that he had not obtained a written or on–the– record waiver of conflict from Duncan.

As to his trial strategy, Roberts said that it was to portray Norman as the killer, stated that Pedicini never asked him to alter his defense of Duncan, and asserted that he did not change his tactics to benefit himself, Pedicini, or Norman.

6

Roberts acknowledged that he had considered calling as a witness Alvin Norman, who had heard Nor man confess to shooting Holmes. Roberts explained that he decided not to call Alvin because he believed Alvin's testimony constituted inadmissible hearsay and because Alvin could put an Uzi in Duncan's hands at the scene. Even after Duncan's PCR lawyer pointed out that Roberts had conceded at trial that Duncan had a gun, Roberts maintained that his judgment at the time of trial was that Alvin's testimony would be more hurtful than helpful to Duncan's case.

Alvin then testified, and stated that although he had not been present when Holmes was shot, both Nor man and Duncan had told him about the incident shortly ther eafter. Alvin reportedly learned from Nor man that Duncan had hidden behind the apartment door with a gun, but that Norman had shot Holmes. Duncan, on the other hand, told Alvin that he had been talking to Henderson and Holmes when Norman burst out from behind the door and chased the two down the stairs, and then Duncan had decided to follow them. Alvin asserted that he passed his infor mation on to Roberts because he wanted to set the r ecord straight when Norman did not tell the truth. Alvin stated that he was subpoenaed as a witness and sat in the hall during Duncan's trial, expecting to testify, but that Roberts eventually decided not to use him, telling him that he would not be a credible witness because the jury would think that Duncan had put him up to testifying.

Duncan then testified at the PCR hearing, and disavowed any intent to kill either Henderson or Holmes. He r eported that Roberts had initially stated that Alvin would be "vital to [his] defense," 6T at 54, but infor med him later that Alvin's testimony was not necessary. Duncan also asserted that he had asked Roberts to call Douglas Sher man as a witness but did not recall why Roberts failed to do so. He denied any knowledge of Roberts' and Pedicini's fee agreement but claimed that he had no pr oblem with some of his bail being used to pay Norman's lawyer and that he had intended for any of the money left over after his own defense to be used for this purpose. Duncan insisted he had no knowledge of the attorneys' partnership until seeing Roberts' affiliation on his appeal brief.

7

The trial court denied Duncan's PCR petition on January 26, 1995. The court concluded there was no actual conflict because it credited Roberts' testimony and found that Pedicini and Roberts had not become partners until after Duncan's trial. The Appellate Division reversed. In an unpublished per curiam opinion, it held that Roberts had been, or had held himself out to be, Pedicini's partner at the time of Duncan's trial, and also found Roberts' reasons for failing to call Alvin as a witness were "not supportable." App. Div. Op. at 7. While the court acknowledged that Roberts may have declined to use Alvin's testimony pursuant to some reasonable strategy, it held that it was constrained by New Jersey Supreme Court pr ecedent to "resolve all doubts in favor of giving [Duncan] a new trial." Id. at 8. However, a differ ent panel of the Appellate Division affirmed the denial of Norman's PCR petition, finding that Pedicini was not Roberts' partner and had no conflict of interest at the time of Norman's trial.

The New Jersey Supreme Court granted (and consolidated its consideration of) the State's petition for certification regarding the reversal of Duncan's conviction, Duncan's cross-petition, Norman's petition concerning the denial of PCR relief in his case, and the New Jersey Public Defender's motion to enter the case as amicus curiae. On July 8, 1997, the Court reversed the Appellate Division's judgments in both Duncan's and Norman's cases. See State v. Norman, 151 N.J. 5, 697 A.2d 511 (1997).2

The Court noted that its rulings provide for br oader protection against conflicts of inter est as a matter of New Jersey constitutional law than is provided under the federal constitution. Under the New Jersey constitution, a per se conflict arises if a private attorney, or one associated with that attorney, is involved in simultaneous dual representations of co-defendants; pr ejudice will be presumed unless there has been a valid waiver. Absent such joint representation, defendant must show "a great likelihood of prejudice" to establish constitutionally defective representation. Id. at 25, 697 A.2d at 520.

_____

2. With respect to Norman, the Court found Duncan's payment of Pedicini's fees created a conflict of inter est for Norman's attorney, and ordered a new trial.

8

The New Jersey Supreme Court held that the trial court finding that Pedicini and Roberts were not partners prior to or during the respective trials of Norman and Duncan was supported by substantial credible evidence and was entitled to deference. The Court noted that Roberts had represented Norman at his arraignment only because Pedicini was trying a case in federal court, but stated that Norman's arraignment was pro forma, lasted no more than a minute or two, and involved no discussion of the case other than an acknowledgment that Norman received a copy of the indictment and discovery, waiver of reading of the indictment, and entry of a plea of not guilty. The Court held that Roberts was merely filling in at the arraignment and did not engage in the type of representation of Norman that gives rise to a per se conflict. See id. at 27-28, 697 A.2d at 522.

The Court also held it would not expand its per se conflict rule to cases where attorneys represent co-defendants while the attorneys are conducting partnership negotiations. See id. at 29, 697 A.2d at 522-23. The Court then found that Roberts' representation of Duncan was not impaired by either a potential or an actual conflict of interest that prejudiced Duncan. The Court further held that because Duncan failed to object to the trial court's jury instructions at trial or on direct appeal, he could only challenge them in the context of an ineffective assistance of counsel claim. It then found that Roberts' failure to object to the erroneous accomplice-liability instruction was not unreasonable and did not prejudice Duncan's trial. It remanded the case to the Appellate Division for consideration of Duncan's remaining ineffective assistance of counsel claims.

On remand, the Appellate Division considered and rejected Duncan's remaining claims. Duncan again petitioned the New Jersey Supreme Court for certification, which the Court denied on May 21, 1998. See State v. Duncan, 154 N.J. 608, 713 A.2d 499 (1998).

C. Federal Habeas Corpus Proceedings

Duncan petitioned for a writ of habeas corpus in the District of New Jersey on August 10, 1998, which the

9

District Court denied. The court did not certify it for appeal. After Duncan filed a timely Notice of Appeal, this court granted a certificate of appealability pursuant to 28 U.S.C. S 2253(c)(1) with respect to his claims that: (1) his right to counsel was violated by a conflict of inter est; (2) counsel was ineffective for failing to call or interview witnesses favorable to the defense; (3) the accomplice liability and transferred intent jury instructions wer e erroneous; and (4) counsel was ineffective for failing to challenge those instructions.3

II.

The District Court had jurisdiction over this case under 28 U.S.C. S 2254 and this court has appellate jurisdiction under 28 U.S.C. SS 1291 and 2253. This court applies a plenary standard of review when a district court dismisses a habeas petition based on a review of the state court record and does not hold an evidentiary hearing, as in this case. See Zilich v. Reid, 36 F.3d 317, 320 (3d Cir. 1994).

Under 28 U.S.C. S 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts must give considerable deference to the determinations of state courts. Section 2254(d) precludes federal habeas relief as to:

> any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court pr oceeding.

_____

3. The State requested that this court r econsider the propriety of a certificate of appealability, and asked that we summarily dismiss Duncan's appeal. Given the serious nature of Duncan's crime, sentence, and constitutional claims, we decline to do so.

10

The Supreme Court has interpreted this standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the corr ect governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000). The Court further explained that whether a state court's application of federal law is "unreasonable" is judged objectively and that an application may be incorrect but still not unreasonable. Id. at 409-10.

In conducting a habeas analysis, we must affor d state courts' factual findings a presumption of correctness, which the petitioner can overcome only by clear and convincing evidence. See 28 U.S.C. S 2254(e)(1). This presumption applies to the factual determinations of both state trial and appellate courts. See Dickerson v. Vaughn , 90 F.3d 87, 90 (3d Cir. 1996).

III.

A. Conflict of interest

Duncan argues that Roberts' actual conflict of interest was evidenced by the facts that the attorney: (1) appeared at Norman's arraignment, (2) introduced himself at trial as Pedicini's partner, (3) split Duncan's bail money with Pedicini as each attorney's fee for repr esenting Duncan and Norman, (4) failed to call a key witness in Duncan's defense, and (5) continued to represent Duncan on appeal after the finalization of his partnership with Pedicini. Duncan contends that this conflict deprived him of his Sixth Amendment right to counsel and prejudiced his defense. He also asserts that the trial court err ed in failing to conduct a conflict inquiry.

11

1. Actual Conflict

The determination whether an attorney engaged in multiple representation is a mixed question of law and fact and therefore not subject to the pr esumption of correctness. See Cuyler v. Sullivan, 446 U.S. 335, 341-42 (1980). However, we can only grant Duncan's habeas petition if we find that the New Jersey courts' determination in this case is contrary to or constitutes an unr easonable application of, governing Supreme Court precedent. See Williams, 529 U.S. at 399. Because he raised no conflict objection at trial, Duncan "must demonstrate that an actual conflict of interest adversely af fected his lawyer's performance" to prevail on his Sixth Amendment claim. Cuyler, 446 U.S. at 348.

Actual conflict is more likely to occur in cases of joint representation (of co-defendants at the same trial) than in cases of multiple representation (of co-defendants at separate trials). See United States v. Mor elli, 169 F.3d 798, 810 (3d Cir.), cert. denied, 528 U.S. 820 (1999); see also Burger v. Kemp, 483 U.S. 776, 784 (1987) ("[A]s we noted in Cuyler, the provision of separate murder trials for the three coindictees `significantly r educed the potential for a divergence in their interests.' "). Actual conflict is also more easily established when the attorney has taken a positive step benefitting another client than when the attorney was passive and failed to act on behalf of the petitioner. See Morelli, 169 F.3d at 810 (citing United States v. Gambino, 864 F.2d 1064, 1070 (3d Cir. 1988)).

This case presents at most a case of multiple representation, and Duncan cites only passive lapses in representation by Roberts, not positive acts. Therefore, to establish a violation of his Sixth Amendment right to counsel, Duncan must:

> "[f]irst . . . demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or

12

> not undertaken due to the attorney's other loyalties or
> interests."

Id. (quoting Gambino, 864 F.2d at 1070).

The New Jersey Supreme Court found no multiple
representation in this case, either by Roberts individually or
through his association with Pedicini. Regar ding Norman's
arraignment, the Court noted that Roberts clearly stated he
was temporarily filling in for Pedicini, Nor man's counsel,
who could not attend due to a federal court appearance,
and he entered Norman's not-guilty plea. Given Roberts'
minimal role and the fact that Norman's arraignment did
not last more than a couple minutes or entail any exchange
of confidential information, the Court found Roberts had
not "represented" Norman. See Norman, 151 N.J. at 27-28,
697 A.2d at 521-22.

Duncan argues that arraignments may involve
confidential exchanges of information when defendants and
their lawyers determine pleas and possible defenses and
request bail, but he does not challenge the New Jersey
Supreme Court's factual description of Nor man's
arraignment or provide any evidence that it entailed any
confidential communications. Instead, Duncan ar gues that
the Court's characterization of Roberts' appearance as a
mere formality was an unreasonable application of
Supreme Court precedent because arraignments are a
crucial part of criminal cases, citing Kirby v. Illinois, 406
U.S. 682, 689-90 (1972). The Kirby Court did describe the
time from a defendant's arraignment to the beginning of his
trial as "perhaps the most critical period of the
proceedings," id. at 688 n.6 (quotation omitted), and noted
that "[t]he initiation of judicial criminal proceedings is far
from a mere formalism," id. at 689. However, the context of
these statements was an opinion holding that the Sixth
Amendment right to counsel does not attach until
adversary judicial proceedings are initiated against a
defendant. See id. at 688. Kirby does not preclude, or
render unreasonable, the New Jersey Supr eme Court's
conclusion that Roberts' appearance at the arraignment did
not constitute a "representation" of Norman for purposes of
an analysis under Cuyler.

13

As to the attorneys' fee agreement, the New Jersey Supreme Court held that Pedicini's compensation from Duncan's bail money created a conflict for Pedicini, with a significant likelihood of prejudice to Nor man, but no corresponding risk of prejudice to Duncan. See Norman, 151 N.J. at 34-36, 697 A.2d at 525-26. The Court further noted that because Pedicini no longer repr esented Norman at the time he joined the partnership, Roberts' subsequent representation of Duncan on direct appeal merely constituted "successive" representation. Although the Court acknowledged Roberts' self-introduction as Pedicini's partner at Duncan's trial, it deferred to the PCR court's finding that the attorneys' partnership was not official until May 1, 1990, after the trial, and it held that substantial credible evidence (both attorneys' testimony and corroborating documentary evidence) supported this finding. See id. at 27-28, 697 A.2d at 521-22.

The finding that the attorneys were not technically partners during Duncan's trial is both well-supported and subject to a presumption of correctness. The determination that they were not "partners" for the purposes of multiple representation is not an unreasonable one. In fact, we have found lawyers with similarly entwined, but not officially combined, practices not to be "associated" within the meaning of Federal Rule of Criminal Procedur e 44(c). See United States v. Pungitore, 910 F .2d 1084, 1139-40 (3d Cir. 1990) (citing Cuyler, 446 U.S. at 347, for the proposition that a court may reasonably rely on attor neys' own description of the nature and extent of their professional associations).

Finally, the New Jersey Supreme Court held that even if Roberts' decision not to call Alvin Norman as a witness was motivated by a conflict of interest,

> Alvin's testimony would not have affected the overwhelming evidence that . . . Duncan . . . was at least an accomplice to the murder. . . .[It] simply would have suggested that it was Norman and not Duncan who actually hit Holmes. Whose shot felled Holmes, however, was not dispositive of the murder charge if Duncan, as all of the credible evidence indicated, shared the murderous intent.

14

Norman, 151 N.J. at 32, 697 A.2d at 524. The Court also pointed out that if Alvin had testified regarding Norman's out-of-court statement, the State could have introduced into evidence Norman's statement to the police, which further implicated Duncan as an accomplice.

In fact, Duncan has not shown that the use of Alvin's testimony constituted a viable alternate defense strategy. He argues that Alvin's testimony would have lent his own account of the shooting more credibility and that if the jury had heard evidence that Duncan did not fire the fatal shot, "it may have analyzed his other conduct in a less culpable light, such that he did not share his co-defendant's murderous intent." Br. for Appellant at 36. However, the identity of the actual shooter is not particularly relevant to Duncan's liability, given the State's reliance on the accomplice theory of liability.

Nothing in Alvin's proposed second-hand testimony contradicted Clarence's first-hand account, or the evidence tending to show Duncan's complicity in the shooting. Nor would it have provided a basis for distinguishing Duncan's state-of-mind from Norman's at the time of the shooting. Even Alvin would have placed Duncan waiting for Henderson with a gun in the Moody apartment, possibly hidden behind the door. Moreover, as noted by the New Jersey Supreme Court, the use of Alvin's testimony would have rendered admissible Norman's potentially damaging statement to the police. Norman, 151 N.J. at 33, 697 A.2d at 524.

Duncan has also failed to provide any evidence that Roberts' decision not to call Alvin was undertaken due to the attorney's other loyalties, or even that Roberts had other relevant loyalties. The facts that Roberts erroneously believed that Alvin's testimony would have been inadmissible hearsay and that Roberts had no reason to be concerned that Alvin's testimony would have shown Duncan had a gun do not prove that Roberts' motives were tainted by conflict. On the contrary, there is no reason to reject the state courts' characterization of his decision as a strategic one. This is particularly plausible inasmuch as Alvin's testimony was at least as likely to have hurt Duncan's case by corroborating his complicity in the

15

shooting as to have helped it by identifying Nor man as the shooter.

For the above stated reasons, we cannot find that the New Jersey Supreme Court's determination in this case is contrary to, or that its careful analysis constitutes an unreasonable application of, governing United States Supreme Court precedent.

2. Conflict Inquiry

Duncan argues that the trial court err ed in failing to conduct a sua sponte hearing into Roberts' apparent conflict of interest when the attorney introduced himself at Duncan's trial as Pedicini's partner. Duncan cites Cuyler, 446 U.S. at 347, for the proposition that a trial court must make such an inquiry if it knows or reasonably suspects that a conflict of interest exists. The r elevant quotation from the Cuyler opinion makes clear that no such sua sponte inquiry was called for in this case:

> Holloway requires state trial courts to investigate timely objections to multiple representation. But nothing in our precedents suggests that the Sixth Amendment requires state courts themselves to initiate inquiries into the propriety of multiple r epresentation in every case. Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist. Indeed, . . . trial courts necessarily rely in large measure upon the good faith and good judgment of defense counsel. . . . Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.

446 U.S. at 346-47 (citations and footnotes omitted).

In Cuyler, the Court found nothing to indicate the trial court had a duty to inquire into potential conflicts of interest where the co-defendants' trials were severed; no

participant in the petitioner's trial made any objection to the multiple representation; and the attorney's outline of his defense strategy both appeared "compatible with the view that none of the defendants was connected with the [crime]" and suggested that the petitioner's attorney was not afraid to call witnesses whom he might need in later trials (although the attorney ultimately made a strategic decision to rest on the government's case). Id. at 347-48.

Roberts' and Pedicini's association was much more tenuous than that of the lawyers in Cuyler who worked together on three co-defendants' cases. Here, Pedicini never appeared at Duncan's trial or vice versa, and the only evidence linking Roberts and Pedicini was Roberts' single statement of law-firm affiliation. Duncan has not shown that Roberts' written submissions to the trial court indicated this affiliation or that any other evidence before the court would have pointed to it.

Therefore, Duncan's trial judge may not have suspected any multiple representation in Duncan's case, much less the type of special circumstances that would trigger a conflict inquiry into an otherwise presumptively permissible multiple representation. Moreover, the trial court had every reason to believe Roberts intended to pursue Duncan's defense zealously. For example, Roberts had identified Alvin as a witness and subpoenaed him, even though he decided not to call him. It follows that there was no basis for the trial court to initiate an inquiry into the possibility of a conflict of interest on Roberts' part.

B. Ineffective Assistance of Counsel

Duncan argues Roberts' representation of him was ineffective because the attorney failed to call Alvin as a defense witness at trial, declined to interview Douglas Sherman or call him as a witness, and failed to object to the trial court's defective jury instructions. In order to show ineffective assistance of counsel, the petitioner must establish both that his counsel's performance was deficient and that the deficient performance prejudiced his trial to the extent that it undermined confidence in the trial's outcome. See Strickland v. Washington, 466 U.S. 668, 687 (1984). The standard by which we judge deficient

17

performance is an objective standard of reasonableness, viewed to the extent possible from the attorney's perspective at the time, without "the distorting effects of hindsight." Id. at 688–90. "[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact," id., at 698, so this court applies a plenary standard of review, see Hess v. Mazurkiewicz, 135 F.3d 905, 907 (3d Cir. 1998).

1. Failure to Call Alvin Norman

Duncan's principal ineffectiveness claim relates to Roberts' failure to call Alvin as a witness, an issue we have already discussed. The Appellate Division, on remand from the New Jersey Supreme Court, rejected this claim based on that court's finding, in the context of its conflict analysis, that the failure to call Alvin did not prejudice Duncan's defense. Roberts interviewed Alvin and considered using his testimony, but ultimately decided not to call him as a witness. Given our acceptance of the finding that the use of Alvin's testimony would have been more harmful than helpful to Duncan's defense, we cannot find Roberts' failure to call Alvin was an unreasonable lapse amounting to constitutionally deficient performance.

Rather, the failure to use Alvin's testimony amounted to a tactical decision within the parameters of reasonable professional judgment. Cf. Strickland, 466 U.S. at 690 ("[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996) ("[I]n a criminal defense, certain litigation decisions are considered `fundamental' and are for the client to make. . . . [A]ll other decisions fall within the professional responsibility of counsel."). Because we find that Roberts' failure to call Alvin did not rise to the level of deficient performance, we cannot find that the Appellate Division's rejection of Duncan's ineffective assistance of counsel claim based on this failure was an unreasonable application of Strickland.

18

2. Failure to Interview (or Call as a Witness) Douglas
     Sherman

The Appellate Division rejected Duncan's contention that
Roberts' failure to interview or call Sher man as a witness
was an unreasonable lapse and prejudiced his trial. Under
Strickland, "a particular decision not to investigate must be
directly assessed for reasonableness in all the
circumstances, applying a heavy measure of deference to
counsel's judgments." 466 U.S. at 691. However , even
assuming that Roberts' failure to investigate Sherman's
potential testimony rose to the level of deficient performance,[4]
we cannot find the Appellate Division's application of
Strickland unreasonable because Duncan has not shown
any prejudice stemming from Roberts' lapse.

First, Duncan has not shown that Sherman would have
consented to testify at his trial. Sherman, as the Appellate
Division noted, was to be tried after Duncan for Holmes'
shooting, was represented by counsel, and would have
risked self-incrimination had he testified. Mor eover, Duncan
did not provide any sworn statement fr om Sherman in
support of his PCR petition. His only evidence r egarding the
content of Sherman's potential testimony is an unsworn
letter Sherman wrote to Duncan fr om jail in November
1990, well after the completion of Duncan's trial.

Sherman's letter suggests that Norman had admitted
firing the fatal shot and then implicated Duncan. There
was, however, no evidence offer ed at Duncan's trial that
Norman had implicated Duncan in the Holmes shooting.
Historically, the opposite occurred; in Duncan's statement
to the police, he admitted his involvement in the incident
and implicated Norman.

Duncan asks this court to speculate both as to whether
Sherman would in fact have testified on his behalf and as
_____

4. It is difficult to assess Roberts' decision not to investigate
Sherman's
potential testimony, because there does not appear to be any evidence
concerning it in the record. Ther e is only Duncan's PCR testimony that
he told Roberts about Sherman and asked Roberts to call Sherman as
a witness, but that he did not know whether or not Roberts talked to
Sherman or why Roberts did not call Sher man as a witness.

19

to what Sherman's testimony would have been. A habeas petitioner

> must establish a reasonable probability--one sufficient to undermine our confidence in the outcome--that the jury's verdict would have been differ ent if not for counsel's errors. See Strickland, 466 U.S. at 695, 104 S. Ct. at 2068. Such a showing may not be based on mere speculation about what the witnesses [his attorney] failed to locate might have said.. . . Under usual circumstances, we would expect that . . . information [obtainable through an adequate investigation] would be presented to the habeas court through the testimony of the potential witnesses.

United States v. Gray, 878 F.2d 702, 712 (3d Cir. 1989) (quotations omitted). In light of Duncan's failur e to present any sworn testimony by Sherman, he has failed to establish prejudice as a result of Roberts' alleged failure to interview Sherman.

3. Failure to Object to Defective Jury Instructions

The New Jersey Supreme Court found that "[t]here is no question that the jury charge delivered by the trial court was deficient." Norman, 151 N.J. at 37, 697 A.2d at 526.5 It cited State v. Bielkiewicz, 267 N.J. Super. 520, 632 A.2d 277 (1993), for the proposition that an accomplice-liability charge "must include an instruction that a defendant can be found guilty as an accomplice of a lesser included offense even though the principal is found guilty of the

_____

5. The Court analyzed only the trial court's accomplice-liability instructions. It did not discuss Duncan's challenge to the transferred-intent instruction and the Appellate Division disposed of the issue summarily on remand, based on the Court's pr ejudice analysis of the accomplice-liability instruction. The Appellate Division never stated whether the transferred-intent instruction was in fact erroneous. Before this court, neither the State nor Duncan's attor ney addresses the substance of the transferred-intent instruction claims. In his own brief, Duncan challenges the instruction but asserts only that it "would have prevented the jury from considering whether Petitioner was guilty of manslaughter, and not murder." Pro Se Br. for Petitionerat 16. Because our review of the instruction does not r eveal why it would have had this effect, we reject Duncan's challenges to the instruction as meritless.

more serious offense." Nor man, 151 N.J. at 37, 697 A.2d at 526. It found this requirement was violated by the trial court's instructions that "[a] person is an accomplice of another person in the commission of an offense if with the purpose of promoting or facilitating the commission of the offense he solicits such other person to commit it or he aids or agrees or attempts to aid such other person in planning or committing it" and that the defendant "must have shared the same intent, the same purpose requir ed to be proved of the person who actually committed the crime." Id. Nonetheless, the Court held that Roberts' failur e to object to the defective charge did not either rise to the level of deficient performance under the first prong of Strickland, given the substantial deference mandated by that case, or create the magnitude of prejudice r equired under the second prong of Strickland. See Nor man, 151 N.J. at 38-39, 697 A.2d at 527.

Again, we cannot find that the New Jersey Supr eme Court's determination was an unreasonable application of United States Supreme Court precedent. In addition to the broad deference generally accorded to attorneys' decisions under Strickland, we note that "in making litigation decisions, there is no general duty on the part of defense counsel to anticipate changes in the law." Sistrunk, 96 F.3d at 670 (quotation omitted). Therefore, Roberts' failure to object does not rise to the level of deficient per formance under Strickland unless the accomplice-liability instruction was clearly incorrect when given.

As the State points out, Bielkiewicz, the sole case the New Jersey Supreme Court cited in finding the trial court's accomplice-liability instruction defective, was decided after Duncan's 1990 trial. Although Bielkiewicz r elied on principles established in a series of pre-1990 New Jersey Supreme Court cases, see 267 N.J. Super . at 527-30, 632 A.2d at 281-82, application of these principles to accomplice-liability instructions in cases involving murder and manslaughter had not yet been clearly established at the time of Duncan's trial. Accordingly, the New Jersey court's determination that Roberts' failur e to object to the defective charge did not rise to the level of Strickland ineffectiveness is not an unreasonable application of Supreme Court precedent.

21

C. Due Process Challenge to Jury Instructions

Duncan contends that the trial court's defective accomplice-liability instruction deprived him of due process.6 More specifically, he argues that the instruction "created the mis[-]impression that, if the jury found the principal guilty of murder, they also had to convict the accomplice of murder," Br. for Appellant at 41-42, and effectively withdrew the lesser manslaughter charges from the jury's consideration.

As an initial matter, the Supreme Court has stated that "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." Estelle v. McGuire, 502 U.S. 62, 71-72 (1991); see also id. at 67 ("We have stated many times that federal habeas corpus r elief does not lie for errors of state law.") (quotations omitted). Rather, a habeas court must consider " `whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' . . . not merely whether `the instruction is undesirable, err oneous, or even universally condemned.' " Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 146-47 (1973)).

"The burden of demonstrating that an err oneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Id. In determining whether the accomplice-liability charge at Duncan's trial satisfies this burden, we must remember the Supreme Court's insistence that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in

_____

6. In its PCR opinion, the New Jersey Supr eme Court found Duncan's direct challenge to the defective jury instructions was barred because he had not raised the issue at trial or on direct appeal. The parties now dispute whether Duncan has exhausted this claim for purposes of his federal habeas petition. Because this claim is clearly without merit, we decline to address the parties' exhaustion ar guments. See 28 U.S.C. S 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

the context of the overall charge." Cupp, 414 U.S. at 146–47.

A review of the instructions in this case does not support Duncan's contention that they "infected" his trial. In Bielkiewicz, upon which Duncan relies, the court reversed the defendants' murder conviction because the accomplice-liability instruction effectively precluded the jury from considering lesser offenses under an accomplice theory. The court was concerned that " `[w]here one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.' " 267 N.J. 534, 632 A.2d at 285 (quoting Keeble v. United States, 412 U.S. 205, 212–13 (1973)) (emphasis in original). However, the context of the instruction in Bielkiewicz was very dif ferent than it was here. In Bielkiewicz, the co-defendants were tried jointly; the trial court did not inform the jury that the defendants could be convicted of the lesser manslaughter of fenses on an accomplice theory, and did not "even mention accomplice liability in instructing the jury with r espect to these lesser included offenses." 267 N.J. Super. at 531, 632 A.2d at 283.

By contrast, the trial court in Duncan's case began its instructions on the first count of Duncan's indictment with a very detailed charge describing the elements of purposeful or knowing murder, then continued by dir ecting the jury that if it did not find purpose or knowledge, it must consider the lesser included manslaughter of fenses which it described in detail. Only after instructing the jury on all counts of the indictment did the court refer to the State's complicity theory and give the jury its accomplice-liability instruction, which it in no way restricted to the murder charges. Therefore, the jury in this case was clearly told that it should consider the lesser manslaughter of fenses, like the murder charge, under both dir ect and accomplice theories of liability.

We can understand the concern of the court in Bielkiewicz, where the co-defendants wer e tried jointly, that there could be some misunderstanding or some compulsion to treat both defendants alike. Here, adequate instructions were given and we have no reason to believe that the jury

23

did not understand that the accomplice-liability instruction could apply to either type offense. Nothing in the instructions prevented the jury from considering the lesser offenses under an accomplice theory of liability. At most, the fault that one might argue would be one of omission, which the Supreme Court has stated is less serious than a misstatement of the law. See Henderson, 431 U.S. at 155. ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.").

Therefore, we cannot hold that the absence of the specific instruction later required by Bielkiewicz, when viewed in the context of this case, so infected the trial with unfairness as to violate Duncan's due process rights.

IV.

For the foregoing reasons, we will affir m the District Court's denial of Duncan's petition for a writ of habeas corpus.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

24