**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4333
_____

LUTHER GLENN,
                Appellant

v.

SUPT. JAMES T. WYNDER;
DISTRICT ATTORNEY OF THE COUNTY OF
ALLEGHENY;
ATTORNEY GENERAL OF THE COMMONWEALTH
OF PENNSYLVANIA

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 2-06-cv-00513
Chief Magistrate Judge: The Honorable Lisa P. Lenihan

Argued November 21, 2013

Before: AMBRO, SMITH, and CHAGARES,
*Circuit Judges*

(Filed:  February 20, 2014)

Adam B. Cogan [ARGUED]
Suite A
218 West Main Street
Ligonier, PA  15658
     *Counsel for Appellant*

Rusheen Pettit [ARGUED]
Rebecca D. Spangler
Allegheny County Office of
District Attorney
436 Grant Street
303 Courthouse
Pittsburgh, PA  15219
     *Counsel for Appellees*

_____

OPINION
_____


SMITH, *Circuit Judge.*

Appellant Luther Glenn was tried and convicted of
the murder of William Anthony Griffin in the Court of

Common Pleas of Allegheny County ("Court of Common Pleas") and is currently a prisoner of the Commonwealth of Pennsylvania. Glenn appeals the ruling of the United States District Court for the Western District of Pennsylvania ("District Court") denying his Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. He argues that (1) the Court of Common Pleas violated his rights under the Due Process Clause of the Fourteenth Amendment by refusing to grant his motion for a mistrial after an eyewitness proffered contradictory testimony, opting instead to strike the entirety of this testimony and provide cautionary jury instructions, and (2) after the Court of Common Pleas struck this testimony, his trial counsel was ineffective in not moving to strike other evidence in the record that referred to this witness's identification of Glenn as the murderer. For the reasons that follow, we will affirm the judgment of the District Court.

I.

On December 17, 1997, William Anthony Griffin was shot and killed on Sterrett Street in the Homewood neighborhood of Pittsburgh, Pennsylvania. Days later, on December 22, 1997, Glenn was arrested after fleeing from the police in a stolen vehicle. He was subsequently charged with Griffin's murder.

Glenn's trial in the Court of Common Pleas took place in June of 1999. During that trial, Georgianna

3

Cotton testified that she witnessed Glenn murder Griffin. Cotton originally testified that after leaving a bar at 5:00 AM, intoxicated to the point of staggering,[1] she encountered Griffin on Sterrett Street and engaged in a brief conversation with him. As she made her way into a nearby partially abandoned building to smoke marijuana and crack cocaine, she saw Glenn standing on the corner of Sterrett Street and Kelly Street, talking with some of his friends. Cotton entered the building, climbed the stairs to the second floor, and began smoking crack cocaine on a balcony that overlooked the street.[2] She soon heard (and possibly saw) Glenn and Griffin arguing, and then heard Glenn tell Griffin he was going to kill him.[3] *Id.* Shortly thereafter, Cotton saw Glenn walk around the corner onto Kelly Street and saw Griffin enter the first floor of the building she was in. Within a few seconds, she saw Glenn return in a blue station wagon, pull up in front of the building, and jump out of the car brandishing a pistol sideways. She saw Glenn pull a

---

[1] Cotton originally testified that she drank "7 or 8" Budweisers. She later testified that she drank four Budweisers, seven cans of St. Ides (malt liquor), and three shots of Hennessy between 2:30 AM and 5:00 AM.

[2] Cotton admitted that she had used crack cocaine for seven years prior to the night of the murder. She also admitted that she was on probation for theft and other charges at the time.

[3] Cotton first testified that she could not see the two men arguing, but shortly thereafter testified she could see them.

hoodie over his head, run towards Griffin—who was then standing in the doorway of the building—and shoot him six times. She then saw Glenn return to the car and leave. Finally, Cotton testified that, as she was running down to check on Griffin, she encountered Dwayne Youngblood ("Youngblood"), the occupant of a first-floor apartment in the building in which Griffin was shot, who told her not to say anything about the murder she had just witnessed.

On cross-examination, Cotton began to contradict herself. She testified that she had not actually seen the shooter's face, but was able to identify Glenn based on what people told her on the streets. On redirect, she testified that she *was* present during the murder, but that she "was also threatened." At that point, the judge declared a recess to address Cotton's contradictory testimony in his chambers. During this *in camera* proceeding, Cotton at first told the judge that she had indeed witnessed the murder, but that she had been threatened "[b]y the defendant's people on the street." After receiving promises that she would not be prosecuted for perjury, she then said that she did not see the murder, but that people told her Glenn was the murderer. She went on to equivocate about whether Youngblood (the first-floor resident) had asked her to testify against Glenn or specifically asked her *not* to

5

testify against Glenn.[4]  Thereafter, the judge adjourned the trial until the following day to provide the prosecutor with an opportunity to assess his case and decide how to proceed.  In the interim, the Commonwealth granted Cotton immunity from any potential perjury charges and she received a court-appointed attorney.

The next day, Cotton again took the stand.  On redirect-examination, she testified that during the previous day's *in camera* proceeding she had told the attorneys and the trial judge that she had not seen Glenn kill Griffin.  When the Commonwealth asked her to provide a truthful account of what, if anything, she saw or heard, she claimed that she heard arguing and gunshots, but did not see anything until after the shooting, when she witnessed Glenn and "a couple other guys" running away from the crime scene and jumping into a car.  When asked why she changed her story, she claimed that she "was scared for somebody else's life that knew what happened."  On recross-examination, however, Cotton testified that she did see shots being

---

[4]    This testimony was a source of confusion between the attorneys and the trial judge.  *See*, *e.g.*, J.A. 612 (Glenn's trial counsel explaining to the trial judge that "I really didn't understand what [Cotton] said yesterday in chambers even.  That's why I asked you to have the court reporter transcribe it.  Maybe I'm stupid, but I couldn't figure out what she was saying.").

fired, at which point Glenn's counsel moved for a mistrial. In response, the judge declared a recess.

After some discussion between the court and counsel, the judge denied the motion for a mistrial but invited defense counsel to move to strike Cotton's entire testimony from the record. Glenn's counsel promptly did so. Thereafter, the judge returned the jury to the courtroom and issued the following instructions:

> THE COURT: Good afternoon, ladies and gentlemen. The Court has made the following ruling on its own motion: You are to completely [and] totally disregard the testimony of Ms. Cotton. Her testimony is not to play any part in your determination as to the facts in this case. It is as if she has not testified. Do you understand that, ladies and gentlemen?
>
> THE JURY: Yes.

J.A. 645.

Cotton's testimony was not the only incriminating evidence offered at trial. The Commonwealth also presented testimony from Jerry Pratt, an inmate who shared a cell with Glenn in the Allegheny County Jail after Glenn's arrest. Pratt testified that, on January 28, 1998, Glenn told him that he had murdered Griffin in the

7

Homewood neighborhood of Pittsburgh, Pennsylvania following an argument over "a bad drug deal." Glenn also told him that a female had witnessed the crime from the balcony of an apartment building, but that her testimony would not hold up in court because she was a crack addict and because her view was obscured. When Pratt opined that this testimony could still be damaging, Glenn responded "I'm really not worried about it, because I have a person out there who can take care of her for me." J.A. 706. Glenn identified that person as Monte Blair.

The Commonwealth then offered evidence that two days before the alleged conversation between Glenn and Pratt police had engaged in a vehicle pursuit of Blair, in which Blair had crashed his vehicle but escaped on foot. When police searched Blair's wrecked vehicle, they recovered a .45 caliber Glock semi-automatic handgun loaded with 13 rounds of ammunition and equipped with a laser sight. During summation, the Commonwealth argued that when police engaged Blair's vehicle he was en route to murder Cotton in order to prevent her from testifying.

The Commonwealth also presented testimony from Charina Johnson, who was involved in a sexual relationship with Glenn prior to Griffin's murder. Johnson told the jury that Glenn had asked her to testify that he was at her house at the time of the murder but that she had refused to do so. She went on to testify that she

could not remember if he was there, though she was impeached with a prior statement that Glenn was *not* there and had asked her to lie.[5]

Finally, the Commonwealth presented testimony from Youngblood that Glenn had been at his residence (located in the apartment building where Griffin was shot) six to seven hours before the shooting occurred.

At the close of the trial, the judge reiterated his earlier instruction to disregard Cotton's testimony:

> THE COURT: [Y]ou must not consider any testimony . . . which I have ordered stricken from the record. So that it is clear, Ladies and Gentlemen, I ordered st[r]icken from the record the testimony of Ms. Cotton. You must not, I repeat, must not, consider that testimony for any reason whatsoever. It should be as if that witness never took the stand.

J.A. 884.

On June 11, 1999, the jury convicted Glenn of first-degree murder and the judge sentenced him to life imprisonment. Glenn then filed post-sentencing motions,

---

[5] Johnson signed this prior statement during an August 10, 1998 interview with the prosecutor in the presence of a police officer.

9

which were denied on October 25, 1999. Thereafter, the Pennsylvania Superior Court ("Superior Court") affirmed his conviction and the Supreme Court of Pennsylvania denied his Petition for Allowance of Appeal.

After unsuccessfully pursuing collateral relief in the Pennsylvania courts, Glenn timely filed a Petition for a Writ of Habeas Corpus with the District Court on April 18, 2006. On September 19, 2012, the District Court denied his petition, but later granted a certificate of appealability on the following issues: (1) whether the Court of Common pleas violated Glenn's due process rights when it refused to grant a mistrial, opting instead to strike Cotton's testimony, and (2) whether, after Cotton's testimony was stricken, trial counsel was ineffective in not moving to strike other evidence referring to Cotton's identification of Glenn as the shooter. Glenn timely appealed.

## II.

We have jurisdiction over Glenn's claims by virtue of the District Court's certificate of appealability and 28 U.S.C. §§ 1291 and 2253. The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241, and 2254. We review the District Court's decision *de novo*, as it did not conduct an evidentiary hearing on these claims. *Duncan v. Morgan*, 256 F.3d 189, 196 (3d Cir. 2001).

10

Our review of Glenn's habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, which provides:

> (d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted . . . unless the adjudication of the claim [raised] –
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Glenn pursues both of his present claims under subsection (d)(1), and argues that the Superior Court's decision finding neither a due process violation nor a Sixth Amendment violation involved "unreasonable application[s]" of "clearly established Federal law." *Id.*

11

## III.

Glenn's first claim is that the Court of Common Pleas violated his rights under the Due Process Clause of the Fourteenth Amendment when it denied his motion for a mistrial based on Cotton's inconsistent testimony. Importantly, this claim requires more than a showing that the Court of Common Pleas erred under Pennsylvania law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Rather, the scope of our review is "the narrow one of due process, and not the broad exercise of supervisory power [we] would possess in regard to [our] own trial court." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974).

To prevail on his due process claim, Glenn must prove that he was deprived of "fundamental elements of fairness in [his] criminal trial." *Riggins v. Nevada*, 504 U.S. 127, 149 (1992) (internal quotation marks and citation omitted). Glenn must tread a steep hill. The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly, based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Medina v. California*, 505 U.S. 437, 443 (1992). In order to satisfy due process, Glenn's trial must have been fair; it need not have been perfect. *See United States v. Hasting*, 461 U.S. 499, 508 (1983).

12

Glenn argues that Cotton's unreliable testimony rendered his trial fundamentally unfair. He insists that the trial judge's curative instructions could not purge the record of the taint from this testimony and that a mistrial was the only constitutionally adequate remedy. It is well established that, absent extraordinary circumstances, jurors are presumed to follow the instructions given them by the court. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *United States v. Bornman*, 559 F.3d 150, 156 (3d Cir. 2009). Glenn, however, urges us to abandon that presumption because, in his view, most of the remaining evidence in his case "directly or tangentially related to Cotton's identification of Glenn as the shooter" and, accordingly, "no jury could render an impartial verdict . . . without Cotton's trial testimony on some level seeping into the deliberations." Appellant's Br. 30.

In support of this argument, Glenn relies upon three cases wherein we concluded that curative instructions were insufficient to purge the record of inadmissible evidence because that evidence was too difficult for the jury to ignore. Each of these cases is distinguishable.

In *United States v. Lee*, 573 F.3d 155, 160 (3d Cir. 2009), the jury, during deliberations, discovered handwriting on the back of a hotel room registration card indicating that the defendant had extended his stay through the date on which police found illegal narcotics

13

in his room. This information, which had never been disclosed to the defense, "had much of the credibility of properly admitted evidence" and "entirely defeat[ed]" the defendant's argument that he had checked out of the room days earlier. *Id.* at 163. Though the jury was instructed to ignore this evidence, on appeal we held that "[u]nder these highly unusual circumstances" we would not assume that the jury was able to ignore "the elephant in the deliberation room." *Id.* at 163-64. In contrast, the jury in Glenn's case was repeatedly instructed to ignore testimony that had already been cast into doubt by defense counsel's successful cross-examination. This testimony would have been far easier for Glenn's jury to disregard than the veritable smoking gun discovered by Lee's jury in the eleventh hour of his trial.

We view *Vazquez v. Wilson*, 550 F.3d 270 (3d Cir. 2008), as similarly distinguishable. In *Vazquez*, the jury was asked to ignore a non-testifying co-defendant's statement implicating the defendant in a murder because the statement violated the defendant's Sixth Amendment Confrontation Clause rights under *Bruton v. United States*, 391 U.S. 123 (1968). 550 F.3d at 272-75. The statement there had not been revealed until closing arguments and therefore had not been discredited in any way. Here, Cotton's testimony had been severely discredited during cross-examination. Further, in *Vazquez*, the jury, after receiving instructions to ignore the co-defendant's statement, asked the judge during

14

deliberations whether it was "supposed to not consider [the co-defendant's] statement that Vazquez was the shooter," which we considered to be direct evidence that the original instruction "was not completely effective, if effective at all." *Id.* at 275. The jury in Glenn's case never suggested any such misunderstanding.

Finally, Glenn's reliance on *Moore v. Morton*, 255 F.3d 95 (3d Cir. 2001), is likewise unavailing. In *Moore*, we found curative instructions to be inadequate to purge the record of three wildly inappropriate arguments made by the prosecutor during summation that "asked the jury to decide the case on bias and emotion rather than on the evidence presented." *Id.* at 118. *Moore* involved prosecutorial misconduct, while no such issue is before us in this case. Moreover, we relied heavily in *Moore* on the weakness of the remaining evidence against the defendant, which consisted primarily of testimony based on hypnotically enhanced memory. *See id.* at 111-13, 119. Here, the Commonwealth offered ample evidence of Glenn's guilt, including, *inter alia*, evidence that he had admitted guilt to a fellow inmate. *Moore* is simply not analogous.[6]

---

[6] The District Court also held that *Moore* was not "clearly established Federal law determined by the Supreme Court" for purposes of AEDPA because it was decided by a lower federal court and was decided after the Superior Court's judgment. This analysis is wrong. Glenn does not

15

Because we presume that Glenn's jury was able to follow the instructions to disregard Cotton's unreliable testimony, this testimony did not render Glenn's trial "fundamentally unfair." Accordingly, the Superior Court's decision affirming his conviction was not error, much less an "unreasonable application" of "clearly established Federal law." 28 U.S.C. § 2254(d)(1).

## IV.

Glenn also argues that his trial counsel was ineffective in not moving to strike lingering references to Cotton's identification of the shooter after the trial judge struck her testimony from the record. Glenn argues that because of this failure "the trial court's remedy of striking Cotton's testimony was largely meaningless." Appellant's Br. 45.

---

argue that the Superior Court unreasonably applied *Moore* itself, but that *Moore*, as factually analogous precedent, is evidence that the Superior Court unreasonably applied Supreme Court precedent concerning broader principles of due process. *See Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 890 (3d Cir. 1999) (en banc) ("[W]e do not believe federal habeas courts are precluded from considering the decisions of inferior federal courts when evaluating whether the state court's application of the law was reasonable . . . . [I]n certain cases it may be appropriate to consider [these decisions] as helpful amplifications of Supreme Court precedent.").

16

To prove ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), Glenn must prove (1) that his trial counsel's performance was "deficient, that is, it fell below an objective standard of reasonableness," and (2) "that counsel's deficient performance prejudiced" him, *i.e.,* that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2007) (citing *Strickland*, 466 U.S. at 689-92 (1984)). We have previously referred to these as the "performance" and "prejudice" prongs of the *Strickland* test. *See, e.g., United States v. Booth*, 432 F.3d 542, 546 (3d Cir. 2005).

Glenn identifies six pieces of evidence that his trial counsel should have moved to strike. With respect to five of these pieces of evidence, Glenn's claim is procedurally defaulted. With respect to the remaining piece of evidence, his claim lacks merit.

A.

In his habeas proceeding in the District Court, Glenn identified, for the first time, five pieces of evidence that his trial counsel should have moved to strike:

1) The Commonwealth's opening discussing [sic] the testimony of Cotton,

17

2) Police testimony that Glenn's photo was shown to Cotton because a confidential informant had identified Petitioner as the shooter,

3) Police testimony that Cotton had identified the shooter as "Ray-Ray," Glenn having been identified at trial as going by the name "Ray-Ray,"

4) Police testimony that Cotton had identified the shooter as having short hair at the time of the shooting, Glenn having been identified at trial as having short hair a few days after the shooting, and

5) Police testimony that the shooter was identified by Cotton as having worn a blue jacket with yellow letters on it, Glenn having been identified at trial as having worn a blue jacket with yellow letters on it close to the time of the Griffin homicide.

J.A. 63-64.

Because Glenn failed to identify these claims in his Post Conviction Relief Act ("PCRA") petition, he is now time-barred from raising them in the Pennsylvania courts. *See* 42 PA. CONS. STAT. § 9545(b). Ordinarily, this procedural default would constitute an independent and

18

adequate state law ground for the Superior Court's decision and would bar our review. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Glenn, however, urges us to excuse this default under *Martinez v. Ryan*, __ U.S. __, 132 S. Ct. 1309 (2012), because his PCRA counsel's failure to raise these claims itself constituted ineffective assistance of counsel.

Procedural default may be excused when the petitioner can prove both "cause" for the default and "actual prejudice" that resulted from the failure of the state court to hear the claim. *Coleman*, 501 U.S. at 750. Under *Martinez*, the failure of collateral attack counsel to raise an ineffective assistance of trial counsel claim in an initial-review collateral proceeding[7] can constitute "cause" if (1) collateral attack counsel's failure itself constituted ineffective assistance of counsel under *Strickland* and (2) the underlying ineffective assistance of

---

[7] *Martinez* applies only to "initial-review" collateral proceedings—collateral proceedings that provide the first opportunity for a petitioner to pursue his ineffective assistance of trial counsel claim. *Id.* at 1315. Because Glenn was represented by the same attorney at trial and on direct appeal, his PCRA proceeding provided the first opportunity to pursue his ineffective assistance of trial counsel claim. *See Com. v. Williams*, 732 A.2d 1167, 1177 n.6 (Pa. 1999) ("[W]here a petitioner's trial and appellate counsel are the same, counsel would not generally be permitted to claim his own ineffectiveness in . . . direct appeal proceedings.").

trial counsel claim is "a substantial one," which is to say "the claim has some merit." 132 S. Ct. at 1319.

Because Glenn's underlying ineffective assistance of trial counsel claims are not "substantial," we conclude that default was not excused.

1.

In four of Glenn's five procedurally defaulted claims, he argues that his trial counsel should have moved to strike police testimony that referred to Cotton's identification of Glenn in order to explain the course of Griffin's homicide investigation. We hold that these claims are not "substantial" and, therefore, that the District Court correctly refused to excuse their default.

First, any failure by Glenn's trial counsel to move to strike this evidence from the record was not "objectively unreasonable" under *Strickland* because this evidence was at least arguably admissible. In Pennsylvania, "certain out-of-court statements offered to explain the course of police conduct are admissible on the basis that they are offered not for the truth of the matters asserted but rather to show the information upon which police acted." *Commonwealth v. Jones*, 658 A.2d 746, 751 (Pa. 1995). While Glenn is correct that not all such statements are admissible, and that Pennsylvania courts are required to "balance the prosecution's need for the statements against any prejudice arising therefrom,"

20

*id.*, it is not clear that the Court of Common Pleas would have assessed this balance in favor of Glenn, given the minimal prejudicial value of this evidence, as discussed below. Because a reasonable attorney could have concluded that this testimony was admissible, we cannot say that trial counsel's failure to move to strike it from the record was "objectively unreasonable" under *Strickland*.

Second, trial counsel's failure to move to strike this evidence was not prejudicial because the jury was not likely to have attributed much, if any, weight to it. The jury had little reason to trust Cotton after being exposed to the various contradictions in her testimony, defense counsel's successful impeachment of her, and the instructions from the trial judge to disregard her testimony entirely. In fact, the police testimony referring to Cotton's identification of Glenn may well have been prejudicial to the Commonwealth, insofar as it suggested that the police investigation against Glenn was based in part upon information received from an unreliable informant. The other evidence presented, including Pratt's detailed and independently corroborated testimony regarding Glenn's jailhouse confession, provided an ample basis for the jury's verdict. Accordingly, any lingering references to Cotton's identification of Glenn as the shooter were unlikely to have a material effect on the jury's ultimate finding of guilt.

21

Because there is no merit to Glenn's underlying ineffective assistance of trial counsel claims, we agree with the District Court that the procedural default of these claims is not excused under *Martinez*.

2.

Glenn's fifth procedurally defaulted claim is that his trial counsel should have moved to strike references to Cotton's testimony in the prosecutor's opening statements. This claim, too, is insubstantial. These statements were not prejudicial to Glenn because the jury was repeatedly instructed not to consider the arguments of counsel as evidence. In fact, considering that the prosecution failed to produce the testimony it had promised, these statements most likely prejudiced the prosecution, not the defense. *See McAleese v. Mazurkiewicz*, 1 F.3d 159, 166-67 (3d Cir. 1993) ("The failure of counsel to produce evidence which [sic] he promised the jury during his opening statement that he would produce is indeed a damaging failure . . . ."). Accordingly, we agree with the District Court that the procedural default of this claim is not excused under *Martinez*.

B.

Finally, we address Glenn's claim that his trial counsel should have moved to strike evidence "regarding photo arrays in which the defendant's photo was

22

identified by Georgina Cotton." While this claim, unlike the previous five claims, was preserved in Glenn's PCRA petition, we conclude that it lacks merit. We cannot say that the failure of Glenn's trial counsel to move to strike this evidence was "objectively unreasonable" given that the photo arrays, like the police testimony discussed above, were arguably admissible to explain the course of the investigation into Griffin's death. Further, this evidence was not prejudicial to Glenn given the vigorous attack by the defense on Cotton's credibility and the strength of the other evidence against Glenn, including Pratt's testimony about the jailhouse confession.

## V.

For the foregoing reasons, we will affirm the District Court's judgment and deny Glenn's Petition for a Writ of Habeas Corpus.

23