**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————————

No. 13-3684

————————————

SALVADOR MORALES a/k/a Simon Pirela

v.

DONALD VAUGHN, et al;
THE ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA;
THE DISTRICT ATTORNEY FOR PHILADELPHIA COUNTY


SIMON PIRELA a/k/a Salvador Morales,

Appellant

————————————

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. No. 2-90-cv-05105)
District Judge: Honorable Joel H. Slomsky

————————————

Argued January 12, 2015

Before: AMBRO, FUENTES and ROTH, <u>Circuit Judges</u>

(Filed: July 20, 2015)

Arianna J. Freeman, Esq.    **(Argued)**
Keisha N. Hudson, Esq.
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
          *Counsel for Appellant*

Thomas W. Dolgenos, Esq.       **(Argued)**
Molly S. Lorber, Esq.
Susan E. Affronti, Esq.
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA 19107
            *Counsel for Appellees*

————————

OPINION[*]

————————

ROTH, <u>Circuit Judge</u>

Simon Pirela, aka Salvador Morales, appeals the District Court's order, denying his habeas petition. He argues that counsel was ineffective for failing to raise a diminished capacity defense at the guilt phase of his trial. Because we find that Pirela suffered no prejudice, we will affirm.

## I. Background

On August 29, 1982, Pirela brutally murdered Georgie Figueroa. After leading Figueroa into a trap, Pirela ordered his brother "Dency" to kill Figueroa. When Dency balked, Pirela slapped him in the face and stabbed Figueroa repeatedly in the chest, eventually announcing that Figueroa was dead. Somehow, Figueroa attempted to escape. Upon discovering this, Pirela handed a knife to another brother "Cobo," who stabbed Figeuroa in the back several times, killing him. Pirela then told his associates to "clean up" and "get rid of the body." When the body was discovered by the police on

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

September 9, 1982, the autopsy revealed that Figueroa had been stabbed at least twenty times:  eight times in the front and twelve in the back.

On May 18, 1983, Pirela and Cobo were convicted of murder and conspiracy to commit murder.[1]  On direct appeal, the Pennsylvania Supreme Court affirmed Pirela's conviction and sentence.[2]  Pirela argued that the trial court had erred by refusing to continue the sentencing hearing to allow Pirela's counsel to consult Dr. Gino Grosso, a court-appointed psychiatrist who had examined him prior to trial.  The court held that Pirela "gave no indication to the [trial] court (nor to this Court) as to how the psychiatrist's testimony would have been beneficial," and "made a knowing, intelligent and voluntary waiver, on the record, of his right to present any evidence at the sentencing hearing."[3]

In 1987, Pirela filed a petition for state collateral review.  New counsel was appointed and argued that trial counsel had rendered ineffective assistance by failing to present mitigating evidence at the sentencing hearing.  The petition was denied and the denial was upheld on appeal.[4]  In 1990, Pirela filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Pennsylvania; the petition was suspended pending exhaustion of state court remedies.

On June 8, 1992, Pirela filed a second state post-conviction relief petition, alleging, *inter alia*, that trial counsel was ineffective for failing to procure the trial

---

[1] The subsequent procedural history is long, and complicated, so for brevity we discuss only that which is relevant to the issue before us.
[2] *Commonwealth v. Morales*, 494 A.2d 367 (Pa. 1985).
[3] *Id.*
[4] *Commonwealth v. Morales*, 565 A.2d 820 (Pa. Super. 1989).

3

testimony of Dr. Grosso. On September 17, 1997, the Pennsylvania Supreme Court held that all of Pirela's claims were meritless or previously litigated with the exception of prosecutorial misconduct at sentencing.[5] With respect to Dr. Grosso, the Pennsylvania Supreme Court analyzed only a claim of ineffective assistance at the sentencing phase. The court found that the claim was both previously litigated and meritless, because the Pirela could only speculate that Dr. Grosso's testimony would be beneficial and Pirela's waiver of his right to present mitigating evidence at sentencing was "knowing, intelligent and voluntary."[6]

On January 17, 2001, Pirela reopened the federal habeas proceedings, but they stalled for nearly six years.[7] In October of 2008, Pirela's habeas case was assigned to a Magistrate Judge for a Report and Recommendation. On April 29, 2013, the Magistrate Judge recommended that the petition be dismissed with prejudice, reasoning that (1) the claim was defaulted because "[i]n state court, [Pirela] did not claim that counsel was ineffective in failing to present a diminished capacity defense," and (2) the claim was meritless because Pirela was unable "to establish that at the time of Mr. Figueroa's death, [Pirela] was suffering from a mental disorder that specifically affected the cognitive functions of deliberation necessary to formulate a specific intent to kill." On May 22,

---

[5] *Commonwealth v. Morales*, 701 A.2d 516 (Pa. 1997).
[6] *Id.* at 521.
[7] The proceedings stalled while Pirela sought relief in the state courts from a death sentence in another murder conviction. On April 30, 2004, the court presiding over the other matter ruled that Pirela lacked the mental capacity to justify the death penalty under *Atkins v. Virginia*, and was thus ineligible for execution under the Eighth Amendment. The Pennsylvania Supreme Court affirmed on August 20, 2007, in an unpublished, per curiam order.

2013, the District Court approved and adopted the Report and Recommendation, with one modification. The court held that the Magistrate Judge had applied an incorrect standard of review, but concluded nevertheless that the analysis was the functional equivalent of the *de novo* analysis required by the correct standard.

## II. Discussion

We exercise plenary review over the District Court's habeas decision.[8] Because this habeas proceeding began before the passage of the Antiterrorism and Effective Death Penalty Act of 1996,[9] we apply a *de novo* standard of review to state court rulings regarding pure legal questions and mixed questions of law and fact.[10]

### A. Pirela's Claim Was Not Procedurally Defaulted

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."[11] To demonstrate that his claim was not defaulted, Pirela must demonstrate that the claim in his habeas petition "was the substantial equivalent of that presented to the state courts,"[12] including both the "legal theory and supporting facts."[13] Pirela must also demonstrate he raised his claim at each

---

[8] *Simmons v. Beard*, 590 F.3d 223, 231 (3d Cir. 2009).
[9] *Woodford v. Garceau*, 538 U.S. 202, 207 (2003).
[10] *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).
[11] *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quotation marks and internal citation omitted).
[12] *Lambert v. Blackwell*, 134 F.3d 506, 513 (3d Cir. 1997).
[13] *Doctor v. Walters*, 96 F.3d 675, 678 (3d Cir. 1996), *abrogated on other grounds by Beard v. Kindler*, 558 U.S. 53 (2009).

available level of appellate review,[14] giving the "state courts . . . an opportunity to correct the constitutional violation in the first instance."[15]

In his second petition for state collateral review, Pirela had alleged that trial counsel was ineffective for "failing to preserve his right to the assistance of a psychiatrist at trial and sentencing" by failing to consult with court-appointed psychiatrist Dr. Grosso either before or during the guilt phase proceedings. The state review court had ordered Pirela to submit a brief with more specificity regarding "facts that would support diminished capacity or other psychiatric defense." While the thrust of Pirela's responsive argument related to sentencing, Pirela mentioned diminished capacity, distinguished between trial and sentencing, and discussed mental health evaluations that suggested his regular drug use could have reduced his mental capacity. Admittedly, the brief never identified diminished capacity as a defense to the murder charge and never described how his drug use could have prevented Pirela from forming the specific intent to kill. Pirela, however, need not have proven the merits of his case to avoid procedural default; he must only have raised it.[16]

After the state petition was denied, Pirela appealed to the Pennsylvania Supreme Court, where he once again advanced the ambiguous psychiatric defense theory based on his counsel's failure to consult with Dr. Grosso before trial. The Pennsylvania Supreme Court did not read Pirela's brief to raise a guilt-phase issue and ruled again on the

---

[14] *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).
[15] *Id.*
[16] *See Baldwin*, 541 U.S. at 29.

sentencing claim.[17]  Nevertheless, the fact that the court did not address the guilt phase

claim does not render it procedurally defaulted.  Pirela argued for ineffectiveness at both

trial and sentencing, and accordingly, we conclude that guilt phase ineffectiveness was

fairly presented.

### B.  Pirela Suffered No Prejudice Due to His Counsel's Failure to Investigate

To succeed on an ineffective assistance of counsel claim, Pirela must show (1) that

his counsel's performance was deficient under "an objective standard of reasonableness,"

and (2) that he was prejudiced by counsel's failures.[18]  To demonstrate prejudice, Pirela

must show that there is "a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different."[19]

Pirela argues that if the original jury had been presented with evidence of his

mental health, drug usage, and diminished intellectual capacity, there is a reasonable

probability that the jury would have determined that he lacked the ability to formulate a

specific intent to kill.[20]  Specifically, Pirela argues that his trial counsel failed to even

investigate a diminished capacity defense.  Certainly, we have found ineffective

assistance in cases where counsel fails to adequately investigate.[21]  There was, however,

no prejudice here.

In order to succeed on a diminished capacity defense, Pirela must be able to

demonstrate that, although he intended the attack, he did not and could not have intended

---

[17] *Morales*, 701 A.2d 516.
[18] *Strickland v. Washington*, 466 U.S. 668, 688 (1984).
[19] *Id.* at 694.
[20] *Id.*
[21] *Jacobs v. Horn*, 395 F.3d 92, 101 (3d Cir. 2005).

7

it to result in Figueroa's death.[22] Such a finding is exceedingly unlikely. A jury would have been presented with the facts that Pirela ordered Dency to "Kill Georgie!", slapped Dency for balking at the order, stabbed Figueroa repeatedly himself. Then, after announcing that Figueroa was dead, and discovering that Figueroa yet lived, Pirela handed Cobo a knife to kill Figueroa *again*, and finally ordered his associates to dispose of the body. It is almost unimaginable that a jury could find specific intent lacking in this case.

## II. Conclusion

For the above reasons, we conclude that Pirela suffered no prejudice due to his trial attorney's failure to investigate his meritless diminished capacity defense. We will affirm.

---

[22] *Commonwealth v. Bracey*, 795 A.2d 935, 946 n.10 (Pa. 2001).

AMBRO, Circuit Judge, dissenting

My colleagues and I agree that Mr. Pirela's ineffective-assistance-of-counsel claim is not procedurally defaulted. We part ways, however, in my colleagues' rejection of his claim on the ground that he has failed to demonstrate prejudice. Because I believe Pirela is entitled to an evidentiary hearing on this question, I respectfully dissent.

Counsel's performance in this case is a textbook example of deficiency; it is one of the more appalling cases of so-called legal representation I have seen. To provide a client with constitutionally effective assistance, "counsel must, at a minimum, *conduct a reasonable investigation* enabling him to make informed decisions about how to best represent his client." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994) (emphasis in original). This investigation must include "an independent examination of the relevant facts, circumstances, pleadings and laws." *Foster v. Dugger*, 823 F.2d 402, 405 n.9 (11th Cir. 1987). It is deficient for a lawyer not to investigate a potential diminished-capacity defense where "he knew or should have known from [the client's] behavior and from his interaction with [the client] that he should initiate some investigation of a psychological or psychiatric nature." *Jacobs v. Horn*, 395 F.3d 92, 103 (3d Cir. 2005) (internal quotation marks omitted).

Here, counsel erred not merely in failing to conduct an adequate investigation into his client's diminished capacity, but in failing to conduct *any* pretrial investigation at all. Had counsel taken the time for the most rudimentary interview of his client, he would have known of a diminished-capacity defense with potential merit. *See, e.g.*,

1

*Commonwealth v. Pirela*, No. 2143-45, slip op. at 19 (Pa. Ct. Comm. Pl. Apr. 30, 2004) (crediting the testimony of "the parole agents [at the prison] who worked with Pirela [who] uniformly report[ed] him to be 'special needs', speaking like a child of about 10 or 12 years old," and the testimony of "[o]ne counselor . . . that Pirela's 'degree of difficulty' was unique among the prisoners that [she] dealt with and no one else suffered with a similar 'impairment'"). Conversations with Pirela's family would have revealed the same. *See* J.A. 1543–50 (affidavits of numerous family members stating that they have known of Pirela's intellectual challenges since he was a child and that they would have offered to testify on Pirela's behalf had they been asked by counsel to do so).

Although the "failure to investigate a critical source of potentially exculpatory evidence" can never be characterized as "strategy," *United States v. Bayne*, 622 F.2d 66, 69 (3d Cir. 1980) (*per curiam*), we need not engage in even minimal speculation as to counsel's gross neglect. After failing to speak to Pirela *for the first time* until just a few days before trial and Pirela's family members *at all*, it first occurred to counsel *midway through trial* to have his client evaluated by a psychiatrist. Not only was the halfhearted effort too late, counsel failed to heed the judge's warning to have the psychiatrist ready to testify on the first day of his client's case-in-chief. That opportunity came and went with counsel introducing no evidence and calling no witnesses on his client's behalf. At a post-trial hearing, recalling his failure to secure a psychiatric testimony on time, counsel casually remarked, "Now that was a mess."

Because of his failure to prepare even minimally for Pirela's case, counsel never learned of the overwhelming evidence that Pirela was suffering from severe intellectual

2

handicaps.  Not only is Pirela "well within the mentally retarded range" and/or at the level of a young child on every standardized test, but PET and MRI scans reveal "egregious[] abnormal[ities]" in his brain, including "globally decreased function in almost the entire cortex."  Such evidence of "mental retardation, brain damage and other mental health and cognitive impairments" is "the specific type [of evidence] in which [a] diminished capacity defense as to the [victim's] murder . . . is appropriate" under Pennsylvania law.  *Horn*, 395 F.3d at 105.  Several experts have opined that a brain with such defects as Pirela's would not be capable of the premeditation and forethought necessary to formulate specific intent for first-degree murder.

There also is compelling evidence in the record that Pirela could have presented a viable voluntary intoxication defense based on his addiction to a dangerous cocktail of alcohol and drugs (the latter a mix of heroin, Quaaludes, cocaine, and valium).  *See Commonwealth v. Fletcher*, 861 A.2d 898, 907 (Pa. 2004) (holding that "a showing of voluntary intoxication can . . . reduce the crime of murder from first to third degree").  One medical doctor submitted an affidavit stating that Pirela's substance abuse "could by itself have caused certain forms of organic brain damage . . . [and] would be likely to have significantly magnified the physical effects of any pre-existing combination of personality disorder and organic brain damage"; and a second doctor testified at an *Atkins* hearing in another case involving Pirela "that the vast majority of the brains with this degree of impairment could not . . . make a goal-directed plan and carry it out after a substantial delay in time."

3

That counsel had no knowledge of any of the information relevant to either a diminished-capacity or voluntary-intoxication defense became clear to everyone in the courtroom (except perhaps his client with a 57-point performance IQ) during the penalty stage. After announcing that he still had not spoken with the court-appointed psychiatrist and he did not know whether his "client [was] on drugs," counsel could muster up only the following argument as to why the jury should spare his client's life:

> [Y]ou are facing a very, very serious problem. Not one that is insurmountable, but one that is very difficult. I was walking around this morning trying to figure it out to approach it and what to say, and it came to my mind out of the clear blue sky that the quality of mercy is not strained, it droppeth as a gentle rain from heaven.
>
> I think that's about the best instruction that any Judge could give a jury in the determination that you have now to make. My client, Simon Pirela has refused me and His Honor, in your absence to [take] the stand and answer my questions for your benefit as to where he came from, how old he is, what his childhood was like, who his parents were, how he grew up. All the things necessary for you to determine whether under those circumstances, you could find mitigating circumstances, evidence of mitigating circumstances which would counteract in your mind and balance in your mind the aggravating circumstances of his having already been found guilty by a jury in another murder case. He would not take the stand.
>
> . . . .
>
> This I do know and can say, under no circumstances do you to have to—no circumstances does the law require you to give the death penalty unless you decide in your own mind that you should and you will regardless of the circumstances. This question is entirely within your discretion and no further questions can be asked of you no matter what your decision is in this case.
>
> And I ask you to be merciful, to be thoughtful, plus do what in your conscience is the best thing under these circumstances.

4

Again not a single piece of evidence was introduced or witness was called, this time for why the mitigating circumstances in the case required the jury to save his client's life.

In brushing aside counsel's offensive performance and concluding that "[i]t is almost unimaginable that a jury could [not] find specific intent," the majority cites "the facts that Pirela ordered Dency to 'Kill Georgie!', slapped Dency for balking at the order, stabbed Figueroa repeatedly himself[,] . . . handed Cobo a knife to kill Figueroa *again*, and finally ordered his associates to dispose of the body." Majority op. at 8 (emphasis in original). But it ignores the shaky evidence on which these so-called "facts" are based, including that they were elicited from the testimony of two juveniles, themselves implicated in Figueroa's murder and who had every reason to lie. Moreover, virtually every aspect of these two witnesses' trial testimony differed from their earlier statements to police or made under oath, and one of the two witnesses, 16-year-old Lisa Colon (15 years old at the time of the murder), testified at Pirela's preliminary hearing that she did not "[a]t any time . . . see him do anything with the knife."[1] That a jury could hear

---

[1] Among the inconsistences in Lisa Colon's story were the order in which people arrived at her house the night of the murder, who was present in the basement when Figueroa was first stabbed, whether she saw anything that happened, whether she heard screams while she was waiting upstairs, and who then stabbed Figueroa (ultimately killing him) in the living room.

When asked at trial "[h]ow many different stories [he] t[old] police," the second witness, 17-year-old Eddie Colon (16 years old at the time of the murder), answered "[t]hree," and admitted that he only agreed to testify against Pirela in exchange for prosecutors' agreement to allow him to plead guilty in another murder case to "[t]hird degree instead of the electric chair." Among numerous other things, Eddie Colon admitted on the stand that he had previously concocted a made-up story about how his sister was sleeping at the time of Figueroa's murder and came down the stairs only when she heard screams, at which point she was threatened with a gun by Cobo (another boy

5

evidence of intent does not mean it would have found this evidence credible. And even if the jury believed some or all of these facts to be true, the majority fails to explain why they are necessarily inconsistent with a diminished-capacity and/or voluntary-intoxication defense.[2]

Given the weakness of the Commonwealth's case and the strength of a potential diminished-capacity and/or voluntary-intoxication defense, I believe the applicable pre-AEDPA standard entitles Pirela to an evidentiary hearing, at a minimum, to allow him to develop an adequate factual record to prove his entitlement to relief. Absent the benefit of that hearing, my colleagues cannot evaluate the strength of Pirela's defense vis-à-vis the Commonwealth's case, nor do they try to do so. *Hendricks v. Vasquez*, 974 F.2d 1099, 1110 (9th Cir. 1992) ("[A]ssuming the performance was deficient, we cannot determine, without the benefit of an evidentiary hearing, whether that performance had any probable effect on the outcome."); *Lawrence v. Armontrout*, 900 F.2d 127, 131 (8th Cir. 1990) (remanding for an evidentiary hearing "to determine whether trial counsel's failure to investigate and call alibi witnesses prejudiced [the] defense"); *U.S. ex rel. Cross v. DeRobertis*, 811 F.2d 1008, 1016 (7th Cir. 1987) (noting that a "court simply cannot fulfill its obligation under *Strickland v. Washington*, 466 U.S. 668, 692 (1984) to assess prejudice until the petitioner has met his burden of supplying sufficiently precise information").

---

present at the scene of the murder).

[2] For instance, according to one psychiatrist, "[t]he words themselves, 'I'm going to kill you,' may not totally indicate [an individual's] mental state" because "[s]ome . . . drugs produce what is called echolalia, which is simply repeating words."

Moreover, in denying Pirela this chance to prove his claim, the majority assumes that a showing of prejudice is required. But "a complete lack of pretrial preparation puts at risk both the defendant's right to an 'ample opportunity to meet the case of the prosecution,' and the reliability of the adversarial testing process." *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (citation omitted) (quoting *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 275 (1942)). Depending on what Pirela could establish on remand as to his counsel's lack of preparation, this might not be the case. *See also Strickland*, 466 U.S. at 692 ("[C]onstructive denial of the assistance of counsel altogether is legally presumed to result in prejudice."); *United States v. Cronic*, 466 U.S. 648, 659 (1984) ("[I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.").

Finally, in determining the proper standard of prejudice and whether Pirela meets that standard, we must place counsel's failure to investigate in context of his appalling performance in other respects. At trial counsel made no opening statement, introduced no evidence, and called no witnesses. Before choosing to forgo a case-in-chief, counsel put the onus on his illiterate and intellectually challenged client to figure out whether and how to mount a defense, asking him in open court whether he "ha[d] . . . any witnesses[] or any other evidence . . . to bring to the Court's attention." Counsel then proceeded to apologize clumsily to the jury for his client's failure to testify on his own behalf:

> This is not easy, there's no question. Each of you want to hear the other
> side of the story, it's human and it is very difficult for you only to hear the
> Commonwealth's side. However, I have talked to the defendant, my client,

7

Simon Pirela, and he has good and sufficient personal reasons for not taking the stand . . . .

Had counsel not done enough to damage his client's case, his exceedingly short closing argument at the guilt phase was factually and legally incorrect. Distilled to its core, counsel's main argument was that the jury should believe Lisa Colon's testimony that "she had at no time saw [Pirela] do anything to [the victim] Georgie" other than "a little physical slapping or something . . . at the bottom of the stairs."[3] But despite at one point prior to trial Lisa denied having seen Pirela do anything wrong, she in fact testified at trial that Pirela retrieved the knife from the kitchen and ordered the victim killed.[4] Clearly not having grasped the basic legal concept that accomplice and coconspirator liability have nothing to do with who wields the knife,[5] counsel came nowhere close to a coherent theory of defense. He then ended by, in effect, conceding his client's guilt, telling the jury "this [was] not the kind of situation . . . an ordinary citizen . . . would condone or be involved in—drugs, stabbings, and all the rest."

"The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Cronic*, 466 U.S. at 655 (quoting *Herring v. New*

---

[3] Counsel's argument was also internally inconsistent, as he also argued to the jury that it should reject Lisa Colon's testimony as "worthless."

[4] Moreover, Lisa Colon did not testify that Pirela was *not* the one to stab the victim in the basement. Rather, she simply testified that, subsequent to seeing Pirela slap Dency and order him to "Kill Georgie," she went back upstairs.

[5] Indeed, the Commonwealth told jurors during its closing that the judge would instruct them "that an accomplice of one person is as guilty as the person who commits the vital act."

8

*York*, 422 U.S. 853, 862 (1975)).  To deny Pirela an evidentiary hearing denies that principle in my view.  Because I believe that Pirela could establish either a reasonable probability of a different result or that his lawyer's performance was so egregious that a showing of prejudice is not necessary to obtain relief, I respectfully dissent.